UNITED STATES DISTRICT COURT IN THE WESTERN DISTRICT OF WISCONSIN

TROY WEST

    Plaintiff,

v.

BADGER CORRUGATING COMPANY

    Defendant.

**COMPLAINT**

Case No. 3:20-cv-1120

NOW COMES the Plaintiff, Troy West, by his attorneys, Hale, Skemp, Hanson, Skemp & Sleik, and as and for his Complaint against the Defendants, states the following:

## PARTIES

1. Plaintiff Troy West is an adult resident of Wisconsin, who resides at 510 Johnson Street, La Crosse, WI 54601. Mr. West is an African American man.

2. Defendant Badger Corrugating Company ("Badger") is a domestic business corporation in the State of Wisconsin, whose principal place of business is 1801 West Avenue S, La Crosse, WI 54601. Badger's registered agent for service of process is Brian Mlsna, 1801 West Avenue S, La Crosse, WI 54601.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

4. Pursuant to 28 U.S.C. § 1391(c), venue is proper in this Court in the Western District of Wisconsin because and the conduct giving rise to this action occurred in the Western District of Wisconsin. Badger's principal office is located in the Western District, and it does substantial business in the Western District.

## FACTUAL ALLEGATIONS

5.   Between approximately March to August 2019, Troy West worked for Badger, and was employed as a forklift operator working the overnight shift. Mr. West was one of the few African American men employed by Badger and would often be the only African American working during his shifts.

6.   Shane Larson is employed by Badger as a shift supervisor and was Mr. West's immediate supervisor during the pendency of Mr. West's employment.

7.   Problems started in June 2019, when Mr. Larson, along with other employees, began to single out Mr. West, making unfair criticisms about his work.

8.   In late June, in the very early morning hours, Mr. West was leaving Badger's facility after his work shift when he discovered that his vehicle tire had been slashed in the parking lot. It appeared that his vehicle had been targeted as it was the only vehicle in the lot that had been vandalized. This incident left Mr. West shaken, given that it was dark, he was alone, and his vehicle had been singled out. Mr. West reported this incident to Mr. Larson, but Mr. Larson dismissed the incident and failed to make a written note of it. Badger declined to take any steps to investigate the incident.

9.   On July 20, Mr. Larson wrote an email to Badger's human resources manager titled "Troy West." In that email, Mr. Larson stated: "A 3rd party told an employee that Troy went to the bar on a forklift and exchanged what he thought to be drugs (a baggie) for cash." The human resources manager apparently took no further action at that time.

10.   Several months previously, Mr. West informed Mr. Larson that he would need to take a couple days off in July so that he could travel to UW Hospital in Madison and have his blood tested to determine whether he would be a potential match as a kidney donor for his mother,

who suffers from kidney failure. This time off request was approved, but for whatever reason, Mr. Larson failed to make a proper note of it.

11. After completing the blood testing in Madison, Mr. West called Mr. Larson to inform him that he was on his way back to La Crosse. Mr. Larson screamed at Mr. West, stating: "I got shit to do, we can deal with this later" and hung up.

12. Confused, Mr. West called Mr. Larson back to ask if the call had accidentally been disconnected. Mr. Larson confirmed that he had intentionally hung up, accused Mr. West of being a "no-call no-show" at work, repeated that he had "shit to do," and hung up a second time.

13. Mr. Larson's outburst upset Mr. West, and he contacted the human resources department to inform them of what he felt was Mr. Larson's consistently disrespectful behavior toward him.

14. Becky Grapes, Badger's human resources director, convened a meeting between herself, Mr. West, and Mr. Larson to clear the air. During the July 24 meeting, Mr. Larson admitted that he had screwed up by failing to follow through with the paperwork for Mr. West's time off request, and took responsibility for his behavior.

15. However, Ms. Grapes then brought up the allegation that an anonymous Badger employee was told by another anonymous person that they saw Mr. West drive his forklift to a nearby bar to sell a bag of drugs for cash—an anonymous, double hearsay allegation that had blatantly racist overtones. Ms. Grapes said that she took these allegations very seriously and threatened to involve law enforcement. Ms. Grapes further said that if Badger found out if any part of the story was true or "if anything like this should happen in the future," Mr. West would be fired.

16. Mr. West was shocked by this allegation, and also disturbed that Badger would threaten to fire him over a facially ridiculous and racist claim. After pointing out how nonsensical the allegation was, Mr. West even offered to contact the bar and retrieve surveillance footage, but Badger declined to investigate further. Given the timing, Mr. West felt that this threat was made in retaliation for complaining about Mr. Larson's recent outburst.

17. Shortly after this July 24 meeting, Mr. West went above human resources and complained directly to general manager Kevin Hanson about Mr. and other co-workers, all of whom were white, who were singling Mr. West out and criticizing him about his work, talking negatively behind his back, and, in Mr. West's words, "fucking with him." Mr. Hanson convened an emergency meeting so that the employees could air their grievances. Any record of this meeting is absent from Mr. West's employment file. Mr. West also complained multiple other times to Mr. Hanson about these issues. A record of these complaints is also missing from Mr. West's file.

18. In August, shortly after the July 24 meeting, Mr. West arrived to work to find the following pinned prominently to a bulletin board in Badger's office area:



19. What is shown in the above photograph is obvious: it is a toy figurine, partially colored black in what appears to be permanent marker, hanging by his next from a twist-tie or string. What this symbol stands for is just as obvious: It is meant to depict a person of color hanging by his neck from a noose.

20. This figurine was tacked to a bulletin board in a common area that every employee had access to. This bulletin board was directly adjacent to Mr. Larson's office, and near the office of Badger's general manager. There is no way that this figurine would not have been seen by either manager.

21. Mr. West was absolutely horrified and offended by the figurine. He immediately informed Mr. Larson of its presence, and asked Mr. Larson to take it down. Mr. Larson simply laughed and told Mr. West that he did not believe the figurine existed.

22. Badger failed to remove the racist figurine. For several days after confronting Mr. Larson about the figurine, Mr. West saw that it remained prominently displayed in the locker room. Upon information and belief, the figurine remained hanging from the bulletin board area for several more months and in fact was not removed until Mr. West filed a complaint with the Equal Rights Division and the EEOC.

23. After it became clear that Badger was going to take no action to remove the racist figurine, Mr. West became fearful for his life, and no longer felt safe working at Badger. Mr. West felt that Badger was allowing a clear and direct threat of physical violence to be displayed.

24. On or about January 2, 2020, Mr. West filed discrimination complaints with the Equal Rights Division of Wisconsin, as well as the Equal Employment Opportunity Commission.

25. On September 22, 2020, Mr. West asked to withdraw his administrative complaints and requested a Right to Sue letter, which he received the next day.

### CLAIM I: HOSTILE WORK ENVIRONMENT IN VIOLATION OF 42 U.S.C. § 1981

26. Plaintiff re-alleges all previous paragraphs and incorporates them fully as if set forth herein.

27. Section 1981 of Title 42 of the United States Code provides:

    All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the fully and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

28. The term "make and enforce contracts" as used in 42 U.S.C. § 1981 includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

29. In violation of 42 U.S.C. § 1981, Badger, by its agents including Mr. Larson, interfered with and impaired Mr. West's employment contract with Badger by creating, tolerating, and maintaining a hostile environment, and discriminated against Mr. West based on his race. Badger and actual or constructive knowledge that this interference was taking place and did nothing to stop it.

30. The cumulative effect of the refusal to investigate the tire slashing incident, repeated harassment from Mr. Larson and other Badger employees, Mr. Larson's vulgarity-laced phone call, the unsubstantiated "drug deal" accusation, and finally, the prolonged and prominent display of an objectively racist noosed figurine, all severely altered the terms and conditions of Mr. West's employment, humiliated and unreasonably interfered with Mr.

West's work performance, because it created an intimidating, hostile, and offensive working environment that seriously affected his psychological well-being.

31. Badger's racial harassment, and its failure to adequately remediate the hostile environment that it created, unreasonably interfered with and impaired Mr. West's contractual relationship with Badger, and otherwise deprived Mr. West of equal opportunities because of his race, in violation of 42 U.S.C. § 1981.

32. Badger, by its agents including Mr. Larson, deliberately failed and refused to investigate or otherwise rectify the situation. In doing so, they maintained and permitted a racially intimidating, discriminatory, and hostile environment.

33. The conduct of Badger, which included allowing a darkly-colored noosed figurine to hang prominently from a bulletin board right next to a supervisor's office, was objectively offensive to any reasonable person, and Mr. West was subjectively offended by it.

34. As a direct and proximate result of Badger's discriminatory actions, Mr. West has suffered severe emotional distress, mental anguish, humiliation, embarrassment, anxiety about his ability to support his family and future career prospects and earning capacity, and loss of enjoyment of life.

35. As a direct and proximate result of Badger's discriminatory actions, Badger is directly liable to Mr. West in an amount to be determined at trial.

**CLAIM II: CONSTRUCTIVE DISCHARGE IN VIOLATION OF 42 U.S.C. § 1981**

36. Plaintiff re-alleges and incorporates all previous paragraphs.

37. Badger fostered a work environment for Mr. West that was more than just hostile. The noose is a symbol of not just discrimination, but of terror, and is viscerally symbolic of the murder of thousands of African Americans at the hands of lynch mobs in this country. The

fact that a figurine, colored partially black, was also hanging from the noose, makes the symbolism that much more obvious and terrifying.

38. Despite this, instead of immediately quitting, Mr. West sought redress with his immediate supervisor, Mr. Larson, and demanded that the figurine be removed, only be rebuffed by Mr. Larson.

39. By allowing a darkly-colored noosed figurine to hang in a well-trafficked area, and then refusing to take it down, Badger created a work environment that was so intolerable that Mr. West's resignation was not just completely reasonable, but may have been necessary to protect himself from potential physical harm.

40. As a direct and proximate result of Badger and Mr. Larson's discriminatory actions, Mr. West has suffered severe emotional distress, mental anguish, humiliation, embarrassment, anxiety about his ability to support his family and future career prospects and earning capacity, and loss of enjoyment of life.

41. As a direct and proximate result of Badger and Mr. Larson's discriminatory actions, Badger is directly liable to Mr. West in an amount to be determined at trial.

### CLAIM III: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000E-2(A)

42. Plaintiff re-alleges and incorporates all previous paragraphs.

43. Mr. West was discriminated against and harassed based on his race by supervisors and coworkers.

44. The discriminatory statements, threats, and conduct were unwelcome, sufficiently severe or pervasive, detrimentally affected Mr. West, were viewed as subjectively hostile and abusive by Mr. West, and would be viewed as objectively hostile and abusive to a reasonable person.

45. Mr. West complained numerous times to Badger supervisors about the discrimination and harassment, and Badger had actual or constructive knowledge of the ongoing discrimination and harassment.

46. Badger failed to take prompt and appropriate remedial action to prevent or correct further discrimination and harassment of Mr. West.

47. As a direct and proximate result of Badger's discriminatory actions, Mr. West has suffered severe emotional distress, mental anguish, humiliation, embarrassment, anxiety about his ability to support his family and future career prospects and earning capacity, and loss of enjoyment of life.

48. As a direct and proximate result of Badger and Mr. Larson's discriminatory actions, Badger is directly liable to Mr. West in an amount to be determined at trial.

## CLAIM IV: CONSTRUCTIVE DISCHARGE IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000E-2(A)

49. Plaintiff re-alleges and incorporates all previous paragraphs.

50. Because of his race, Badger created and fostered a work environment that was more than just hostile towards Mr. West. Badger caused the conditions of Mr. West's employment to become so intolerable that he had no choice but to resign involuntarily.

51. As a direct and proximate result of Badger's discriminatory actions, Mr. West has suffered severe emotional distress, mental anguish, humiliation, embarrassment, anxiety about his ability to support his family and future career prospects and earning capacity, and loss of enjoyment of life.

52. As a direct and proximate result of Badger and Mr. Larson's discriminatory actions, Badger is directly liable to Mr. West in an amount to be determined at trial.

**WHEREFORE**, Plaintiff, Troy West, respectfully prays this Court for the following relief:

A.  Actual damages in an amount to be proved at trial;

B.  Costs and attorney's fees as provided for under Title VII and § 1981;

C.  Punitive damages as provided for under Title VII and § 1981;

D.  Such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY A TWELVE MEMBER JURY.**

Respectfully submitted this 18th day of December, 2020.

        HALE, SKEMP, HANSON, SKEMP & SLEIK

        By: *Electronically signed by Mason B. Schultz*
        Attorney Mason B. Schultz
        State Bar No: 1102696
        Attorneys for Plaintiff
        505 King Street Suite 300
        P.O. Box 1927
        La Crosse, WI 54601